UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RILEY MCFARLAND, | CASE NO. 1:21-CV-01225-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINSTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

### INTRODUCTION

Plaintiff Riley McFarland filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 22, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to then-Magistrate Judge David A. Ruiz for preparation of a Report and Recommendation, and the parties consented to his jurisdiction. (ECF #7). When Judge Ruiz was elevated to District Judge, this case remained on his docket, but was randomly reassigned to me. (Non-document entry of February 18, 2022).

Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** this matter for additional proceedings consistent with this recommendation.

1

PROCEDURAL BACKGROUND

On July 20, 2017, Mr. McFarland received a favorable decision, awarding SSI benefits based on his disability adjudicated as a child. (Tr. 50-60). When Mr. McFarland attained age 18 on March 14, 2018, his eligibility for benefits was redetermined under the adult rules for determining disability; he was determined not disabled as of May 1, 2018. (Tr. 61-71).

On June 25, 2019, a State Agency Disability Hearing Officer upheld the decision denying benefits. (Tr. 94-115). Mr. McFarland then requested a hearing before an Administrative Law Judge. (Tr. 125). Mr. McFarland (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on April 13, 2020. (Tr. 32-49). On September 30, 2020, the ALJ issued a written decision finding Mr. McFarland not disabled. (Tr. 13-26). The Appeals Council denied Mr. McFarland's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. McFarland timely filed this action on June 22, 2021. (ECF #1).

FACTUAL BACKGROUND

I.      PERSONAL AND VOCATIONAL EVIDENCE

Mr. McFarland attained age 18 on March 13, 2018 (Tr. 18) and was 20 years old at the time of the administrative hearing. (Tr. 24). Mr. McFarland completed twelfth grade. (*See* Tr. 37). Mr. McFarland has no past relevant work. (Tr. 24).

II.     RELEVANT MEDICAL EVIDENCE

**Jessica Goldstein, M.D., Jon Kannesohn, M.D., and Daniel Miller, M.D.** On March 15, 2018, Mr. McFarland attended a routine appointment with Jon Kannesohn, M.D. (Tr. 366-70). Mr. McFarland was also receiving help in school via an Individualized Education Plan (IEP). (Tr.

366, 527). Dr. Kannesohn indicated Mr. McFarland has headaches and tremor, and was on Lamictal and Topamax for those conditions. (Tr. 369). Dr. Kannesohn noted Mr. McFarland experiences headaches three to four times per week, and takes his medications one to two times per week. (Tr. 366, 527). Dr. Kannesohn indicated the "headaches are ok" but that the tremor persists and interferes with Mr. McFarland playing video games. (Tr. 366, 369, 530). Mr. McFarland also experiences poor sleep and has a stressed routine; Dr. Kannesohn contacted the sleep clinic as to other possible interventions. (Tr. 369, 530).

On March 7, 2018, Mr. McFarland met with pediatric neurologist Jessica Goldstein, M.D.. (Tr. 569). He was complaining of worsening tremors that had become "bothersome in fine motor tasks." (Tr. 569). He also complained of leg tremors during basketball, playing video games, and taking the steps at school. (*Id.*). His headaches were unchanged and occurred daily. (*Id.*). Dr. Goldstein indicated that both the tension headaches and tremors may correlate with escalation in psychosocial stressors, and may respond to reengagement in counseling services. (*Id.*). Dr. Goldstein also increased Topamax as a dual therapy for Mr. McFarland's tremor and headaches. (*Id.*).

On June 6, 2018, Mr. McFarland met with Dr. Goldstein for follow-up. (Tr. 564). Dr. Goldstein noted Mr. McFarland had problems with his tremor affecting his activities of daily living, such as shaving. (*Id.*). His headaches had improved, but that may have been related to the end of the school year. (*Id.*). Dr. Goldstein indicated the tremor was worsening over the past six months, and may be related to medication side effect from lamotrigine and sertraline, although Mr. McFarland had been taking these medications for years. (Tr. 568). Dr. Goldstein

recommended discussing medication side effects with Dr. McGee. (*Id.*). An MRI of the brain and lab work were "reassuring for secondary cause" to the tremors. (*Id.*).

On February 6, 2019, Mr. McFarland again followed-up with Dr. Goldstein. (Tr. 559). Dr. Goldstein noted Mr. McFarland's tremor was stable. (*Id.*). Dr. Goldstein described Mr. McFarland as having headaches occurring for over five years, on average four to five times per week, for an hour or more. (*Id.*). Mr. McFarland endorsed nausea, but no vomiting, photophobia, or phonophobia. (*Id.*). He was tolerating gabapentin well without side effects, but felt it was not helping any more. (Tr. 559-60). Dr. Goldstein indicated the headaches were tension headaches, and the tremor was physiologic in nature. (Tr. 563). Dr. Goldstein increased Mr. McFarland's gabapentin dosage to respond to the headaches and tremor. (*Id.*).

On February 13, 2019, an electromyography laboratory report conducted by Daniel Miller, M.D., was abnormal and indicated electrophysiologic evidence of an isolated lesion of the left superficial peroneal sensory nerve. (Tr. 598-99). Left superficial peroneal sensory response could not be obtained despite several attempts. (Tr. 599). Nerve conduction studies in other areas on the left were within normal ranges as compared to the right. (*Id.*).

**Behavioral health.** On March 27, 2018, Mr. McFarland and his mother met with Karen Graves, LPCC. (Tr. 428, 643). At that visit, Mr. McFarland's mother expressed that Mr. McFarland was heartbroken over the passing of his grandfather. (*Id.*). Mr. McFarland reported that he was "struggling in school but determined to get his diploma." (Tr. 434, 648). At this visit, Mr. McFarland was cooperative, had fair eye contact, and unremarkable mood/affect. (Tr. 430, 644).

On April 11, 2018, Ms. Graves indicated Mr. McFarland made "moderate progress" in therapy; she reviewed six steps to manage Mr. McFarland's anger and rehearsed them with him,

4

and provided a safety phrase for him to use, "I must walk away." (Tr. 436, 650). Mr. McFarland

was cooperative, had fair eye contact, and appropriate affect. (*Id.*). Ms. Graves also indicated Mr.

McFarland's IEP was not being followed; she obtained authorization to speak with his school

guidance counselor. (Tr. 440, 654).

On April 26, 2018, Mr. McFarland met with Eileen McGee, M.D., for psychiatric follow-

up. (Tr. 489, 679). Dr. McGee indicated Mr. McFarland was well-groomed, cooperative, and had

good eye contact, with a normal attention span; his mood was euthymic. (Tr. 491-92, 681-82). Dr.

McGee noted Mr. McFarland was experiencing problems with his math teacher not following his

IEP; he was receiving F's in this class, placing him at risk of needing to go to summer school. (Tr.

494, 684). Dr. McGee indicated Mr. McFarland might be able to improve his grades with the help

of case management and avoid needing to attend summer school. (*Id.*). Mr. McFarland was in his

junior year of high school and planned to attend Lakeland Community College for two years

before transferring to a college in Florida for sports management. (*Id.*).

Dr. McGee also noted that Mr. McFarland had difficulty sleeping; on a good night he

could sleep for five hours despite taking all of his medications (Wellbutrin XL, sertraline, Lamictal,

trazodone, and Ambien). (*Id.*). But if Mr. McFarland is depressed, he can sleep around-the-clock.

(*Id.*). Dr. McGee noted Mr. McFarland's mood was better, but he was angry about school; she

stated Mr. McFarland still gets angry very easily. (*Id.*). Dr. McGee also noted that Mr. McFarland's

neurologist changed his medication from Topamax to gabapentin for his tremors; she indicated it

may help to calm him when he gets angry and may also help him sleep. (*Id.*).

On June 27, 2018, Mr. McFarland attended a follow-up appointment with Dr. McGee. (Tr.

685). Dr. McGee noted Mr. McFarland was well groomed, cooperative, and had good eye contact,

with a normal attention span. (Tr. 687-88). He exhibited some irritability but his affect was within

normal range. (Tr. 688). Mr. McFarland had been irritable and would get angry over minor things.

(Tr. 690). He was not sleeping well and would play video games online just before taking his

nighttime medications. (*Id.*). Dr. McGee recommended stopping all electronics one hour before

bedtime and taking Ambien forty-five minutes later, to let his brain calm down before bed. (*Id.*).

Dr. McGee also indicated that Wellbutrin (but not Lamictal) could cause tremors and

recommended decreasing the dosage to see if that helped to reduce the tremors. (*Id.*). Dr. McGee

recommended follow-up in one month to ensure improvement before school started. (*Id.*).

On July 31, 2018, Mr. McFarland met with Katherine Krizman, LPCC. (Tr. 655-60). Mr.

McFarland was cooperative, had pleasant mood/affect, and fair eye contact. (Tr. 656). Mr.

McFarland's mother reported that she would find that he had not taken his sleep medications. (Tr.

660). Ms. Krizman provided Mr. McFarland with a sleep schedule chart so he could work toward

having seven to eight hours of sleep per night. (*Id.*). Ms. Krizman recommended follow-up in three

weeks. (*Id.*).

On August 30, 2018, Mr. McFarland attended a follow-up appointment with Dr. McGee.

(Tr 511, 692). He was well-groomed, cooperative, and had good eye contact, with normal attention

span and affect, but some irritability. (Tr. 514, 694-95). Dr. McGee indicated Mr. McFarland had a

period of noncompliance with his medication that caused him not to sleep at night. (Tr. 516, 697).

He was on a good schedule and was sleeping about three to five hours per night. (*Id.*). Mr. McGee

was irritable, had verbal explosions at school, and pounded on his desk; he shoved people and

threw things at home. (*Id.*). Mr. McFarland had not yet been suspended but it was still very early in

the school year. (*Id.*). Dr. McGee continued Mr. McFarland on his current medications and added 2mg of Intuniv in the morning to give him better impulse control. (Tr. 517, 698).

On October 4, 2018, Mr. McFarland met with Dr. McGee. (Tr. 699). Dr. McGee indicated Mr. McFarland was well-groomed, cooperative, had good eye contact, and normal attention span. (Tr. 701-02). He exhibited some irritability, but his affect was within normal range. (Tr. 702). Mr. McFarland reported that school was going fairly well, but that he still had some outbursts. (Tr. 704). Mr. McFarland was permitted to walk out of the classroom and into another teacher who let him into her classroom if he became upset and needed to calm down. (*Id.*). His teachers were not following the IEP. (*Id.*). Because Mr. McFarland still exhibited a lot of impulsive behaviors, Dr. McGee changed the prescription for Intuniv (guanfacine) to 1 mg twice daily. (*Id.*).

At follow-up on November 28, 2018, Mr. McFarland was well-groomed, cooperative, and had good eye contact, with normal attention span and euthymic mood. (Tr. 706-09). Mr. McFarland reported doing better on the lower dose of Wellbutrin. (Tr. 711). In addition, Dr. McGee noted that "guanfacine has helped his anger" and "[h]e is sleeping well with the trazodone and Ambien combination." (*Id.*). With the help of a special education teacher, Mr. McFarland made the honor roll. (*Id.*). Mr. McFarland commented that "he is on the honor roll because he is trying now." (*Id.*). Dr. McGee continued Mr. McFarland on his current medication regimen. (Tr. 712).

On December 28, 2018, Mr. McFarland met with Ms. Krizman. (Tr. 661). Ms. Krizman indicated Mr. McFarland was cooperative, had fair eye contact, and pleasant mood/affect. (Tr. 662). During this session, Mr. McFarland stated, "anger is the only emotion I feel." (Tr. 666). Ms.

Krizman provided Mr. McFarland with diaphragmatic breathing exercises to help him control his anger. (*Id.*). Ms. Krizman recommended follow-up in three weeks. (*Id.*).

On February 20, 2019, Mr. McFarland attended a follow-up appointment with Dr. McGee. (Tr. 713). He was well-groomed, cooperative, made good eye contact, and displayed a normal attention span and euthymic mood. (Tr. 715-16). Dr. McGee noted Mr. McFarland's bipolar disorder was stable, but he still had difficulty sleeping; some days he would not get to sleep until 3:00 a.m., despite good sleep hygiene with electronics. (Tr. 718). He still experienced some days where he was "quite irritable." (*Id.*). Mr. McFarland made the honor roll for the first two quarters of the school year. (*Id.*). Dr. McGee increased the dosage of trazodone, but made no other medication changes. (*Id.*).

On April 5, 2019, Mr. McFarland met with Ms. Krizman. (Tr. 667). Mr. McFarland exhibited cooperative attitude, good eye contact, and appropriate affect. (Tr. 668). Mr. McFarland reported feeling "good" and shared that he had an outburst at school, but had gone into the hallway to avoid acting out. (Tr. 672). Mr. McFarland completed an anger workbook with Ms. Krizman. (*Id.*). Mr. McFarland was open and engaged during the session and when completing exercises. (*Id.*). He expressed willingness to complete homework (anger journal/worksheets). (*Id.*). Follow-up was scheduled in two weeks. (*Id.*).

On June 6, 2019, Mr. McFarland followed up with Dr. McGee. (Tr. 719). He was well-groomed, cooperative, with good eye contact, and normal attention span. (Tr. 721-22). Dr. McGee noted his mood and affect were "euthymic here but often angry." (Tr. 722). Dr. McGee stated that Mr. McFarland "continues to get angry very easily. A week ago he went to hit his mother. This is not acceptable." (Tr. 724). His sleep remained extremely poor; he would take his medications at

10:00 p.m. but would remain up until 2:00 a.m. or later, and would wake on his own at 7:00 a.m. (*Id.*). Dr. McGee posited "one reason for his anger may have to do with being tired." (*Id.*). Dr. McGee assessed Mr. McFarland as having "[b]ipolar illness with mood not controlled." (*Id.*). Dr. McGee stopped the prescriptions for trazodone and Ambien and started doxepin for sleep; continued Lamictal; stopped Wellbutrin; and lowered sertraline for anger. (*Id.*). Gabapentin was not controlling Mr. McFarland's tremors, and he could not button his shirt or shave. (*Id.*). Dr. McGee recommended discussing this issue with the prescribing doctor. (*Id.*).

On July 8, 2019, Mr. McFarland met with Dr. McGee. (Tr. 756). He was well-groomed, cooperative, with good eye contact, and normal attention span, but his mood and affect were "euthymic here but often angry." (Tr. 759). At this appointment, Mr. McFarland reported significantly worse sleep since the medication change to add Vraylar, stop trazodone and Ambien, and add doxepin. (Tr. 761). He was only getting two hours of sleep per night. (*Id.*). He was "extremely irritable" and getting angry "over anything" because of the lack of sleep. (*Id.*). Dr. McGee continued Lamictal and increased sertraline, and stopped doxepin and Vraylar. (Tr. 761). She also started Mr. McFarland on Seroquel 50 mg, but instructed that he could increase up to a total of 200 mg if he did not respond initially to the lower dose. (*Id.*). Follow-up was scheduled for two weeks later. (*Id.*).

On July 22, 2019, Mr. McFarland returned for follow-up. (Tr. 762). Dr. McGee noted that Mr. McFarland was well-groomed and cooperative, made good eye contact, and showed a normal attention span, but his mood and affect were "euthymic here but often angry." (Tr. 764-65). Mr. McFarland was sleeping for seven hours at night with the help of Seroquel. (Tr. 767). While he remained "quite irritable" (possibly worse than before), this may have been caused in part by taking

a steroid and an antibiotic from a sinus procedure. (*Id.*). Dr. McGee assessed Mr. McFarland as having "[c]ontinued irritability but better sleep." (*Id.*). Dr. McGee added Seroquel XR 150 mg at dinnertime, in addition to the standard Seroquel dosage Mr. McFarland was taking. (*Id.*). Follow-up was scheduled for two weeks later. (*Id.*).

On August 6, 2019, Mr. McFarland met with Dr. McGee. (Tr. 768). She noted Mr. McFarland was well-groomed, cooperative, and with good eye contact and normal attention span. (Tr. 770-71). He reported being angry, sad, and happy all at once, but appeared calmer than he had at the last appointment. (Tr. 771). Mr. McFarland reported sleeping well with Seroquel, but that he "seems like a zombie" after taking the evening dose of Seroquel, and that he needs to take all 350 mg tablets. (Tr. 773). His mood in the middle of the day was not improved and he remained extremely irritable. (*Id.*).

Mr. McFarland was unable to describe what is bothering him, but expressed "feeling happy sad and angry all at the same time and that he is angry at the world." (*Id.*). Mr. McFarland was open to returning to psychotherapy at this visit (he was not willing to consider psychotherapy at previous appointments). (*Id.*). Mr. McFarland reported "just laying on his bed all day;" he likes to play basketball but no one was available to play with, and he likes video games but complains that all of his games are outdated. (*Id.*). Dr. McGee assessed Mr. McFarland as having "continued mood issues." (*Id.*). She stopped Seroquel XR and continued Mr. McFarland's other medications including 150 mg of Seroquel IR at night; she added BuSpar 15 mg twice daily. (*Id.*).

On August 23, 2019, Dr. McGee again noted Mr. McFarland was well-groomed, cooperative, and with good eye contact and normal attention span, but reported being angry, sad, and happy all at once (though he appeared calmer than at the last appointment). (Tr. 776-77). Dr.

10

McGee noted Mr. McFarland was "still not feeling right;" he took Seroquel around 11:00 p.m., stayed up until 2:00 a.m., and slept for around 5 hours. (Tr. 779). He reported being a zombie in the mornings after taking Seroquel, and that he was calmer during the day on BuSpar. (*Id.*). His mother reported that trazodone and Ambien had worked well in the past until Mr. McFarland experienced increased anxiety due to bullying at school. (*Id.*). Dr. McGee stopped Seroquel and restarted Mr. McFarland on trazodone and Ambien, and increased his BuSpar dosage. (*Id.*).

On August 30, 2019, Dr. McGee noted Mr. McFarland was well-groomed, cooperative, had good eye contact, normal attention span, and was calmer and had a normal affect. (Tr. 782-83). He was sleeping much better and getting at least six hours of sleep per night. (Tr. 785). Mr. McFarland had started classes at Lakeland Community College, and was "definitely less angry" after increasing the BuSpar medication. (*Id.*). Dr. McGee noted Mr. McFarland appeared "significantly calmer as opposed to how he has looked for the last 2 months." (*Id.*). Dr. McGee assessed him as "improved." (*Id.*). She continued the current medication regiment but increased his BuSpar dosage. (*Id.*).

At follow-up on October 4, 2019, Dr. McGee indicated Mr. McFarland was well-groomed, cooperative, had good eye contact, normal attention span, and calmer with normal affect. (Tr. 788-89). He was reliably sleeping at least six hours each night, though he was still angering easily. (Tr. 791). Mr. McFarland described two incidents, one in which he got angry at his English teacher for receiving poor feedback on an essay, and another in which he became angry and "made a big scene at the license bureau" after failing his driver's permit exam by one point. (*Id.*). Mr. McFarland was not interacting with his family and remained in his room most of the time. (*Id.*). Dr. McGee recommended Mr. McFarland engage in volunteering as assistant coach in his basketball league or

11

begin a part-time job (but avoid stressful jobs like fast food work). (*Id.*). Dr. McGee assessed Mr. McFarland as having "[s]ome improvement but he really has no ambition or motivation." (Tr. 791-92). She continued Mr. McFarland on his current medication regimen, and reached out to his past therapist so that he could restart with treatment. (Tr. 792).

On October 29, 2019, Mr. McFarland restarted treatment with Christin Carrabine, LPCC-S. (Tr. 796). She noted Mr. McFarland was well-groomed, cooperative, with fair eye contact and blunted affect. (Tr. 797). Mr. McFarland reported a long history of anger and aggression, starting in sixth grade. (Tr. 802). Mr. McFarland isolates to his room most of the time; he reported not having friends. (*Id.*). His mother is afraid to take Mr. McFarland out in public because of his angry outbursts. (*Id.*). Ms. Carrabine educated Mr. McFarland on the relationship between anger as a secondary emotion to hurt/sadness/depression; she validated his feelings but not the behaviors. (*Id.*). She suggested looking into volunteering as an assistant coach with his old team. (*Id.*).

On November 1, 2019, Mr. McFarland met with Dr. McGee. (Tr. 810). Dr. McGee noted that Mr. McFarland was well-groomed, cooperative, with good eye contact, normal attention span; she described him as "angry but calm here and normal affect." (Tr. 812-13). Mr. McFarland reported he was more angry than before; he had given up on his English class and did not go to the writing center for help. (Tr. 815). Dr. McGee discussed with Mr. McFarland that he needs to put effort into not being annoyed by other people—even family members saying "hello" annoy him. (*Id.*). Mr. McFarland spent most of his time in his room. (*Id.*). Dr. McGee assessed him as "[s]till

12

quite irritable." (*Id.*). Dr. McGee discussed increasing the sertraline dosage back to 200 mg per day, but instructed Mr. McFarland that he needs to use therapy to help himself as well. (Tr. 816).

On November 19, 2019, Mr. McFarland met with Ms. Carrabine. (Tr. 803). She indicated he was well-groomed, cooperative, had good eye contact, but constricted mood/affect. (Tr. 804). Mr. McFarland reported that his medication helps with his anger, "but it makes it so I don't have to do anything." (Tr. 808). Ms. Carrabine indicated that Mr. McFarland's willingness to engage in therapy demonstrated progress. (*Id.*). Mr. McFarland had reached out to volunteer as an assistant coach and was awaiting tryouts in the first week of December. (*Id.*).

On December 10, 2019, Mr. McFarland met with Dr. McGee. (Tr. 864). She noted Mr. McFarland was well-groomed, cooperative, had good eye contact, normal attention span, and his mood was less angry and described as good some days. (Tr. 866-67). Mr. McFarland reported that he had some days where his mood was much better. (Tr. 869). He reported liking his new therapist. (*Id.*). Mr. McFarland expected that he passed his classes at Lakeland Community College and was enrolled in four classes the next semester. (*Id.*). Dr. McGee observed that Mr. McFarland "smiled more today than I have seen him do in a long time." (*Id.*). She assessed his condition as "stable" and continued his current medication regimen with no changes. (*Id.*).

Mr. McFarland met with Ms. Carrabine on December 17, 2019. (Tr. 851). He had passed his classes that semester and was signed up for classes again next semester. (Tr. 856). Mr. McFarland talked with Ms. Carrabine about his experience of being bullied. (*Id.*). He was looking forward to going out with some friends; because he was spending a lot of time by himself at home, Ms. Carrabine encouraged him to socialize more. (*Id.*).

13

On December 31, 2019, Mr. McFarland met with Ms. Carrabine. (Tr. 858). He was cooperative, well-groomed, had good eye contact, but constricted affect. (Tr. 859). Mr. McFarland reported having a good time while out socializing with his friends at the mall. (Tr. 863). Mr. McFarland indicated he was planning to attend some basketball games, but was apprehensive of meeting someone there he does not like. (*Id.*). Ms. Carrabine worked through scenarios with Mr. McFarland and how he could maintain control in the situation by walking away or ignoring the person, as well as consequences if he acts out on his anger (such as assault charges now that he is over 18 years old). (*Id.*). Ms. Carrabine provided him with a stress ball to squeeze when he is feeling irritated, angry, or stressed. (*Id.*).

On January 21, 2020, Mr. McFarland met with Ms. Carrabine; he had a cooperative attitude, fair eye contact, but constricted affect. (Tr. 874-75). She noted that Mr. McFarland continued to struggle with sustaining attention and completing tasks, but that he seemed to be making an effort. (Tr. 880).

On February 3, 2020, Mr. McFarland met with Ms. Carrabine, who noted good eye contact, cooperative attitude, but agitated mood/affect. (Tr. 882-83). He shared that he had been having more frequent angry outbursts at home and in public. (Tr. 887). Ms. Carrabine worked through his emotions with him; he acknowledged that he is responsible for his own actions when angry and demonstrated increased self-awareness. (Tr. 888).

On February 18, 2020, Mr. McFarland met with Ms. Carrabine and had cooperative attitude, good eye contact, and appropriate affect. (Tr. 890). Ms. Carrabine completed a BASIS-24 test with Mr. McFarland, in which he scored high in all areas but substance abuse, and indicated a high psychosis score. (Tr. 894). Ms. Carrabine discussed the relationship between depression,

14

emotional lability, and trouble in intrapersonal relationships, and Mr. McFarland expressed

understanding. (*Id.*). Mr. McFarland received F's on his humanities and math tests, and had been

requesting support from Lakeland Community College without response. (*Id.*).

On February 18, 2020, Mr. McFarland met with Dr. McGee. (Tr. 901). He was well-

groomed, cooperative, with good eye contact, normal attention span, but down mood due to

school struggles. (Tr. 903-04). Dr. McGee noted Mr. McFarland was registered with the Office of

Disabilities at Lakeland Community College but he had not requested any assistance. (Tr. 906).

He could not keep up with the teacher and had failed tests. (*Id.*). In response, he made a "very

negative" Instagram post "that sounded like he was suicidal" although he denied any thoughts of

self-harm. (*Id.*). Dr. McGee noted Mr. McFarland's therapist had completed BASIS-24 with him,

but Mr. McFarland indicated he did not understand all of the questions. (*Id.*). Mr. McFarland

reported sleeping five hours at night, which appeared to be adequate for his needs. (*Id.*). He would

become upset if his mother asked to borrow his computer (the only one in the house) because he

likes having a live feed to help him relax. (*Id.*). Dr. McGee noted Mr. McFarland was "[s]table

regarding medications" and made no changes to his prescriptions. (*Id.*).

On March 3, 2020, Mr. McFarland met with Ms. Carrabine. (Tr. 895). He was cooperative,

had appropriate affect, and fair eye contact. (Tr. 896). Mr. McFarland reported "giving up" on

seeking help with his classes. (Tr. 900). He shared recent incidents of "blurting things out" when

angry; Ms. Carrabine suggested writing these thoughts down and later deciding if that is what he

wants to say. (*Id.*). Mr. McFarland reported willingness to try this response. (*Id.*).

### III.  MEDICAL OPINIONS

**State Agency Opinions.** On May 16, 2018, Bonnie Katz, Ph.D., reviewed the evidence at the initial level. (Tr. 66-70). She found that Mr. McFarland had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and in adapting and managing himself. (Tr. 66). Dr. Katz opined that Mr. McFarland was capable of performing simple routine, one- to three-step tasks that do not require strict time deadlines or high production-based quotas; and that he was capable of tasks that do not require him to work in tandem with other staff; he could have no "over the shoulder" supervision, but could interact with a small number of others in a work setting on a superficial basis. (Tr. 68-69).

On May 17, 2018, Anne Prosperi, D.O., reviewed the medical evidence and found Mr. McFarland's physical impairments do not cause any significant functional limitations; she opined Mr. McFarland had no physical limitations. (Tr. 65, 70-71).

On October 2, 2018, Aracelis Rivera, Psy.D., conducted a psychiatric review. (Tr. 534-53). Dr. Rivera indicated Mr. McFarland's diagnosis of bipolar disorder (Tr. 537), and that he would be moderately limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (Tr. 546). Dr. Rivera indicated Mr. McFarland would be moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday/workweek without interruptions from his symptoms. (Tr. 550-51). She indicated Mr. McFarland was also moderately limited in his abilities to interact appropriately with the general public; respond appropriately to criticism from

supervisors; get along with coworkers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 551). Dr. Rivera indicated Mr. McFarland was not significantly limited in any other areas. (Tr. 550-51).

Dr. Rivera described that Mr. McFarland was bullied in school and had been suspended after punching a classmate, related to the bullying. (Tr. 552). Mr. McFarland was described as polite to teachers and peers, but that he struggles with controlling his emotions and behaviors when provoked. (*Id.*). He had been observed with a core group of friends showing adequate social skills. (*Id.*). Mr. McFarland was independent with his personal hygiene but needed reminders from his parent; he did not cook, and needed reminders to take out the trash. (*Id.*). Dr. Rivera opined that Mr. McFarland could carry out simple, repetitive tasks with two-to-three step instructions where he can work at his own pace; can relate on a superficial basis with supervisors and coworkers but should have minimal interaction with the general public; and would do best in a static environment where job demands are routine and predictable. (*Id.*).

On October 5, 2018, James Caccillo, D.O., conducted a medical evaluation. (Tr. 554). Dr. Caccillo indicated Mr. McFarland has bipolar disorder, tremors, heart disease, and ADL's indicating incapacitating migraines. (*Id.*). However, Dr. Caccillo noted Mr. McFarland's symptoms are controlled when he takes his medications. (*Id.*). Despite his symptoms, Mr. McFarland is able play sports and video games. (*Id.*). No problems were noted on the application with using hands or lifting. (*Id.*). Therefore, Dr. Caccillo opined the evidence does not support a severe physical impairment. (*Id.*).

**Dr. McGee.** On June 25, 2019, Dr. McGee completed a medical and functional equivalence questionnaire in which she indicated she had been treating Mr. McFarland as a

psychiatrist for nine years. (Tr. 749-51). Dr. McGee marked that Mr. McFarland had "no evidence

of limitations" in the areas of: acquiring and using information; attending and completing tasks;

moving about and manipulating objects; caring for self; and health and physical well-being. (Tr.

749-50). She opined Mr. McFarland had "moderate limitation" in interacting and relating with

others, stating "will shut down when he gets angry." (Tr. 750). Dr. McGee indicated that Mr.

McFarland had no side effects from his current prescribed medications. (Tr. 751). She opined Mr.

McFarland "should continue counseling" and that he was "not consistent in counseling." (*Id.*).

   **Ms. Carrabine.** On January 21, 2020, Ms. Carrabine completed a mental capacity medical

source statement. (Tr. 870-71). After indicating Mr. McFarland had been under her facility's care

since April of 2010, she opined that Mr. McFarland had the following limitations:

| Degree of Limitation | Ability Limited |
|---|---|
| Moderate | <ul><li>follow one- or two-step instructions</li><li>use reason and judgment to make work-related decisions</li><li>state his own point of view, and</li><li>maintain appropriate personal hygiene</li></ul> (Tr. 870-71). |
| Marked | <ul><li>all other areas related to understanding, remembering, or applying information</li><li>nearly all areas related to interacting with others</li><li>all areas related to concentrating, persisting, or maintaining pace</li><li>set realistic goals or awareness of normal hazards</li></ul> (*Id.*). |
| Extreme | <ul><li>keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness</li><li>respond to demands,</li><li>adapt to changes,</li><li>manage his psychologically based symptoms,</li><li>distinguish between acceptable and unacceptable work performance, and</li><li>making plans for himself independent of others.</li></ul> (*Id.*). |

18

In support, Ms. Carrabine stated Mr. McFarland was diagnosed with bipolar disorder and he "has great difficulty managing mood, especially anger. Has frequent, severe, angry outbursts. Difficulty taking/following direction from others. Sustaining attention, completing tasks, cooperating with others. Low motivation, limited social capacity, easily agitated and unable to regulate emotions. Poor decision making." (Tr. 871).

IV.    OTHER RELEVANT EVIDENCE

**School Records.** Annual IEP review on May 17, 2018, for the 2018-2019 school year indicated that Mr. McFarland qualified for special education services for reading comprehension, math, written expression, organization and on-task behaviors, and expressive language. (Tr. 601-02). Mr. McFarland was enrolled in the college prep curriculum, and was within the general school population for all but one supplemental class. (Tr. 602). He was receiving D's and F's in many courses. (*Id.*). Mr. McFarland showed that when he pays attention and completes his homework, he can bring up his grades; he also does well with positive teacher-student relationships and will work harder for teachers with whom he has a closer relationship. (*Id.*). Mr. McFarland put forth effort on making the right decisions and thinking about appropriate responses during stressful situations. (*Id.*).

Behaviorally, Mr. McFarland sometimes struggles with controlling his emotions and behaviors when provoked. (*Id.*). He was suspended once during the school year for fighting, which he claimed was provoked and that he was "jumped." (*Id.*). However, Mr. McFarland was observed as able to function appropriately in various school settings. (*Id.*). Socially, Mr. McFarland is polite to his teachers and peers. (*Id.*). He was observed to have a core group of friends and showed adequate social skills in both structured and unstructured settings. (*Id.*).

19

Mr. McFarland struggled with multi-step concepts presented in the general classroom. (Tr. 612). His IEP indicated he would benefit from having step-by-step procedures broken down and written down for reference. (*Id.*). Mr. McFarland received extended time, tests sent to the supplemental class for completion, and use of a calculator. (*Id.*). He showed improvement with his in-class behavior, organization, and attention, but his scores were not in line with typical peers due to time management and assignment completion that decreased his scores. (Tr. 615).

On April 2, 2019, Mr. McFarland's high school counselor indicated he was a senior in good standing with an expected graduation date of June 2, 2019. (Tr. 625).

On April 10, 2019, Mr. McFarland's social studies teacher, Jenny Cavell, indicated Mr. McFarland was working hard in his academic courses, but that he needed guidance, structure, and frequent checks to continue his progress. (Tr. 629). He received accommodations that included extended time for assignments, having assignments read to him, and preferential seating near the teacher. (*Id.*). Ms. Cavell stated she was unaware of any specific behavioral concerns inside or outside the classroom. (Tr. 630). Some students aggravated Mr. McFarland, but he takes the appropriate steps to leave the classroom and think through a positive response. (*Id.*). Repeated parental, police, or counselor medication had not been required. (*Id.*). Mr. McFarland also participated in a youth basketball program outside of school. (*Id.*).

V.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. McFarland and VE James Fuller, presented during the hearing before the ALJ.

Mr. McFarland described his inability to work due to anger, stating he "can snap within a second and tell them off or get physical and punch them." (Tr. 35). He also described hand

tremors "so bad, I can't even hold anything." (*Id.*). He believes the hand tremors may be due to Parkinson's, but was unable to go to the movement doctor because of the COVID-19 pandemic. (*Id.*). Mr. McFarland said the last time he punched anyone was the prior year, during high school. (Tr. 36). He almost got into a fight in college because of his anger, but the person walked away before he was able to punch the person. (*Id.*). Mr. McFarland also described an incident in college where he became angry and started yelling because the bookstore refused to give him a book he needed for class. (Tr. 37). Mr. McFarland also described that he would punch the wall when angry; the morning of the hearing he punched his wall because he wanted to stay in bed all day. (Tr. 38-39). He described punching things two to three times per day. (Tr. 39).

He only sleeps two or three hours at night. (Tr. 40). Even though he takes medication to help him sleep, it does not always work. (Tr. 40-41).

Mr. McFarland's mother must wake him up in the morning. (Tr. 44). She must remind him to take his medicine and brush his teeth. (*Id.*). Mr. McFarland takes out the trash, but his mother must remind him to do so. (Tr. 43-44). After he takes out the trash, he goes straight back to his room and does not talk to anyone. (Tr. 44). In his room, he stares at the wall. (Tr. 44). Mr. McFarland stated that when playing video games, he will throw his controller if he loses the game and then will stare at the wall. (*Id.*).

Mr. McFarland was enrolled in college coursework; he described paying attention in class for only five to seven minutes before losing interest for the rest of the class. (Tr. 41-42). He does not understand his homework, so he does not complete it. (Tr. 42). He refuses to go to tutoring because it makes him feel stupid for needing help. (*Id.*).

21

Mr. McFarland has migraines five days per week, with dizziness and nausea. (Tr. 42-43). He does not take any medication for migraines. (Tr. 43). The migraines last for about an hour, with no discernible trigger. (*Id.*). He attends counseling sessions every other Tuesday. (Tr. 43).

The VE then testified. The ALJ presented a hypothetical 20-year-old male, with the same education and work background as Mr. McFarland, with no physical limitations; however, the individual would be limited to no high production quota or piece rate work, or working in tandem with others; the person should not be subject to over-the-shoulder supervision; the person can interact with peers and supervisors on an occasional basis, but no public contact. (Tr. 45). The VE responded by identifying the following jobs: dishwasher (DOT #318.687-010), medium exertion, 500,000 jobs available nationally; packing (DOT #920.587-018), 340,000 jobs available nationally; and sorting (DOT #509.686-014), medium, 200,000 jobs available nationally. (Tr. 45-46).

Mr. McFarland's attorney questioned the VE, and asked a hypothetical to limit the above individual to work in isolation from others, with only occasional contact with supervisors. (Tr. 46). The VE responded that there would be relatively few jobs available for an individual to work in total isolation. (*Id.*). Such jobs would be semi-skilled jobs such as night watchman or security jobs. (*Id.*).

The attorney also modified the first hypothetical to add verbal outbursts at work once per week on a regular and ongoing basis; these outbursts would not necessarily be threatening, but would include anger and yelling. (*Id.*). The VE testified that such regular outbursts would be disruptive enough to eliminate work. (*Id.*).

The VE testified that an employer would tolerate ten percent of off-task behavior, or six minutes per hour. (Tr. 46-47). Absenteeism would be tolerated at one day per month. (Tr. 47).

22

### THE ALJ'S DECISION

The ALJ's September 30, 2020 decision included the following findings of fact and conclusions of law:

1.  The claimant attained age 18 on March 13, 2018, and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18. The claimant was notified that he was found no longer disabled as of May 1, 2018, based on a redetermination of disability under the rules for adults who file new applications.

2.  Since May 1, 2018, the claimant has had the following severe impairments: depressive, bipolar, and related disorders and migraines (20 CFR 416.920(c)). |

3.  Since May 1, 2018, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that since May 1, 2018, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: is capable of unskilled work, with no high production quotas or piece rate work, no working in tandem with others, no over the shoulder supervision, can interact with peers and supervisors occasionally, and can have no public contact.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on March 14, 2000 and is a younger individual age 18-49 (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Since May 1, 2018, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant's disability ended on May 1, 2018, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(Tr. 18-25).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

24

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

25

> 5.     Can claimant do any other work considering her residual functional capacity,
>         age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

DISCUSSION

**I.     The ALJ erred in evaluating the opinion of Mr. McFarland's counselor, and substantial
evidence does not support the ALJ's findings.**

Mr. McFarland argues the ALJ erred by finding the opinion of his counselor, Christin

Carrabine, LPCC-S, unpersuasive. (Pl.'s Br., ECF #11, PageID 964-65). He asserts the medical

records Ms. Carrabine provided are supported by and consistent with her treatment notes and the

medical record. (*Id.* at PageID 964-65, 967-69). As Mr. McFarland points out, the type of evidence

the ALJ cited when evaluating Ms. Carrabine's opinion "should not reflect on the persuasiveness

of a treating provider." (*Id.* at 968-69). I agree.

The Commissioner contends Mr. McFarland's argument is meritless. (Comm'r's Br., ECF

#12, PageID 987). The Commissioner asserts that the ALJ complied with the new regulations

when finding Ms. Carrabine's opinion unpersuasive, and as such, the ALJ's decision was

supported by substantial evidence. (*Id.* at PageID 988-89). The Commissioner provides a review of

26

the medical evidence to show that Mr. McFarland was not as limited as Ms. Carrabine's extreme opinion made him out to be. (*Id.* at PageID 989-90).

I am not persuaded by the Commissioner's argument, because "in dealing with a determination or judgment which an administrative agency alone is authorized to make," a reviewing court "must judge the propriety of such action solely by the grounds invoked by the agency." *Burlington Truck Lines v. United States,* 371 U.S. 156, 169 (1962). Importantly, "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *Id.*

Under 20 C.F.R. § 416.920c, for claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, and is not required to give a treating source controlling weight. *Id.* at § 416.920c(a). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[1] and consistency.[2] *Id.* at § 416.920c(b). The ALJ must explain how those factors were considered, but the terms "supportability" or "consistency" need not appear in the ALJ's analysis. *Hardy v. Comm'r of Soc. Sec.,* No. 2:20-cv-4097, 2021 WL 4059310, *2 (S.D. Ohio Sept. 7, 2021). An ALJ "may, but [is] not required to" explain the remaining factors

---

[1]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[2]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3).

While the regulations no longer require deference to a treating source opinion, "they still require that the ALJ provide a coherent explanation of [his] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And, "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

Here, when finding Ms. Carrabine's opinion unpersuasive, the ALJ explained as follows:

> I do not find the opinions of Ms. Carrabine persuasive, as they are not well supported. While she notes difficulty managing mood, with frequent anger outbursts, and difficulty taking/following direction from others, sustaining attention, completing tasks, and cooperating with others, these are primarily based on subjective reports. Ms. Carrabine also noted that the claimant experiences low motivation and poor decisionmaking. However, Ms. Carrabine's treatment records document blunted, agitated, and constricted affect, but cooperative behavior, normal speech, and fair eye contact. The claimant also participated well with therapy. At the time, he was struggling with some college courses, but was making an effort to maintain attention and complete tasks.

(Tr. 19). The ALJ's articulation of the persuasiveness of Ms. Carrabine's opinion is insufficient to meet the agency's procedural standards, and thus, I am unable to determine if substantial evidence supports his findings. The ALJ does not articulate how he considered the consistency of Ms. Carrabine's opinions as compared with the other medical and nonmedical sources of evidence. And while the ALJ does articulate that he finds Ms. Carrabine's opinion not well supported, the reason given is improper and does not build an accurate and logical bridge between the evidence and the ALJ's conclusions.

The ALJ's characterization of Ms. Carrabine's opinion as "primarily based on subjective reports" reflects a fundamental misunderstanding of the nature of Ms. Carrabine's role as a mental health professional. As the Sixth Circuit has explained, "when mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals. . . ." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (cleaned up). The Sixth Circuit cautioned against rejecting a mental health professional's report due to the subjectivity of the evidence, because "mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness." *Id.*

"[I]nterviews are clearly an acceptable diagnostic technique in the area of mental impairments" and, in that context, a professional may "rely upon the subjective complaints elicited during the interview in formulating his functional restrictions." *Warford v. Astrue*, No. CIV.A 09-52-GWU, 2010 WL 3190756, at *6 (E.D. Ky. Aug. 11, 2010). It is "illogical" for an ALJ to reject a mental health professional's opinion for being based on subjective reports from a claimant, because "psychology and psychiatry are, by definition, dependent on subjective presentations by

the patient. Taken to its logical extreme, the ALJ's rationale . . . would justify the rejection of opinions by all mental health professionals, in every case." *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009).

Because of the nature of Mr. McFarland's mental health disorders, Ms. Carrabine's opinion must necessarily be based on his personal, subjective reports. The ALJ thus erred by finding Ms. Carrabine's opinion unpersuasive on this basis. Other courts within the Sixth Circuit will order a remand where the ALJ rejects a mental health professional's opinion because of the subjectivity of its contents. *See, e.g., Winning*, 661 F. Supp. 2d at 821 (finding an ALJ's explanation failed to satisfy procedural requirements where the ALJ rejected an opinion on the basis that it relied "substantially on the subjective presentation and statements of the claimant . . . ."); *Allen v. Berryhill*, 273 F. Supp. 3d 763, 774 (M.D. Tenn. 2017) ("It was also improper for the ALJ to discredit Dr. Wood's [the claimant's psychiatrist] opinion on the basis that it appeared to be 'mostly based on subjective complaints.'"); *Wyatt v. Colvin*, No. 1:12-CV-289, 2013 WL 2318484, at *8 (S.D. Ohio May 28, 2013) ("[C]ontrary to the ALJ findings, the fact that Dr. Stark's opinions were based on Plaintiff's self-reports does not provide an adequate basis to reject such findings."), *report and recommendation adopted*, 2013 WL 4080718 (S.D. Ohio Aug. 13, 2013).

The explanations offered for finding Ms. Carrabine's opinion unpersuasive fail to create the required accurate and logical bridge necessary between the evidence and the result. *Fleischer*, 774 F. Supp. 2d at 877. Substantial evidence is lacking where there is "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions . . . even where the

conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

I therefore recommend remand.

## II. The RFC fails with respect to Mr. McFarland's mental health limitations.

Mr. McFarland also argues the ALJ's RFC determination does not contain all of the limitations he requires, with respect to his mental health limitations or to limitations imposed by his migraines. (Pl.'s Br., ECF #969-73). The Commissioner opposes, citing evidence in the record to show the RFC appropriately accommodated Mr. McFarland's social interaction limitations. (Comm'r's Br., ECF #12, PageID 983-87). Because the ALJ did not appropriately consider the medical opinion evidence as described above, I conclude the RFC fails with respect to Mr. McFarland's social interaction/mental health limitations.

The ALJ must form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

31

An ALJ's RFC assessment is to reflect the most an individual can do despite his impairments, not the optimized or best conditions for an individual's work. *See Horinek v. Saul*, No. 1:19-cv-2141, 2020 WL 4340987, *9 (N.D. Ohio Jul. 7, 2020) ("[T]he ALJ was not required to create an optimal work setting for Plaintiff. 'Optimal conditions . . . are not necessary ones.'") (quoting *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85-86 (D. Mass. 2018)), *report and recommendation adopted*, 2021 WL 1571659 (N.D. Ohio Apr. 22, 2021). Therefore, the ALJ is not required to adopt all opined limitations into the RFC, even if he finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). However, in so doing, the ALJ must provide an explanation that allows the Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that an ALJ's decision must include a discussion of findings and conclusions, and the reasons or basis for those conclusions, on all material issues of fact, law, or discretion presented on the record).

As discussed above, the ALJ's rejection of Ms. Carrabine's opinion was not supported by substantial evidence. For that reason, the ALJ's evaluation of Mr. McFarland's RFC with respect to his mental health limitations is also not based on substantial evidence, because it does not accurately consider "all evidence in the record." *Avery*, 2020 WL 2496917, at *11.

I therefore recommend remand for re-evaluation of the RFC, after Ms. Carrabine's opinion has been properly considered.

However, I find no error with respect to any limitations imposed by Mr. McFarland's migraines. As the ALJ describes: "The claimant also alleges limitations due to headaches. He testified that he becomes dizzy, nauseous, and cannot concentrate. However, he does not take any medication for migraines." (Tr. 21). Mr. McFarland's physician who treated his headaches did prescribe him medications. (Tr. 366, 369, 527). However, the physician also noted that Mr. McFarland's "headaches are ok." (Tr. 369, 530). At the hearing, Mr. McFarland testified he did not take medication for his headaches. (Tr. 43). It is the role of the ALJ, not this Court, to weigh the evidence, resolve significant conflicts in it, and make appropriate determinations based on the evidence presented. *Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). In this respect, I find the ALJ provided sufficient reasoning, borne out by the record, and, with respect to any limitations imposed by the headaches, the RFC is within the ALJ's "zone of choice." *Mullen*, 800 F.2d at 545.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: August 2, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R.
Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation. *Berkshire v.
Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186,
2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th
Cir. 2019).